Before you begin, Judge Newman needs to take up an issue with all of you. I wanted to state for the record that my son, who is a law school student, is employed currently by one of the firms representing a party in this case. I have considered whether there was any obligation to recuse myself. I've looked at the statute and I've looked at the cases, and I see no such obligation. He's not been involved in the proceeding in any way. However, I want to give you this opportunity, and if on reflection you have further thoughts, you could inform the court, but my present disposition is that I should not recuse myself. With one caveat, you can't wait until the opinion comes out. I have every confidence in your ability to rule fairly, regardless of that fact, and indeed I have every confidence that Mr. Hedges would not punish your son for ruling, if it turns out it would be adverse to the, I assume it's the Quinnette Manual firm, because I'm all alone, so it's not my firm, I'm sure of that. That's a good guess. I appreciate the disclosure, and he'll probably be back in law school by the time I can punish him. All right. Counsel, you may proceed. Good morning. May it please the court. My name is Michael Blaha. I'm here to argue on behalf of the defendants and appellants, Passport Video, Passport International Production Sync, Passport International Production Sync of California, and Dante Puglisi. This essentially is a case about the bounds of fair use with respect to a 16-hour documentary that my client created with respect to the life of Elvis Presley. It is in essence a biography, and therefore, under well-settled law, falls squarely within the fair use exception to the copyright infringement under Section 107. The issues before the court today are essentially whether the trial court abused its discretion in granting the injunction, and then a de novo review of law with respect to the underlying issues that caused that injunction to be issued. I guess the most important one certainly is with respect to the substantial likelihood of success on the merits, and that is pretty much entirely a fair use argument. This is not a case where my client used copyrights like the Napster case or something and simply took pictures from the Elvis estate or took the Ed Sullivan show that Sofa Entertainment owned and just repackaged them and sold them. What about the still pictures, Mr. Blaha? The still pictures, Your Honor, it's interesting. That's exactly where I would make a division here as between the copyrights. Basically, what you've got, you've got several audiovisual images with respect to Elvis Presley's life that will argue, in fact, in terms of the second element, what kind of copyrighted work were they. They're kind of a hybrid. It's a little unusual because he's an entertainer. So to do a historical account of an entertainer, by the very nature, you're going to have to use one of his creative works. But the still photographs, granted, are a little different because they are entire. We use the still photograph, we use the entire copyrighted work, which, of course, doesn't rule out a fair use defense in the third element in terms of the amount and substantiality of the take. But with regard to the still photograph, would you concede that if we do not find a fair use exception with regard to the still photographs, there is a clear infringement here? If you do not agree with our fair use analysis, yes, Your Honor. I mean, that's our sole defense with respect to all of them. But I think it's really important. That would extend to the video as well? I'm sorry? That would extend to the video clips as well? That is correct. I mean, this is a fair use case. There's no allegation otherwise. I mean, frankly, we didn't get a chance to develop it thoroughly on the record. We felt that there were actually a couple of public domain arguments, but they're really not before you today. And certainly the bulk of them are just pure fair use. However, it's interesting, with respect to the photographs, the distinction there is all of the rest of them were excerpts, and that becomes relevant on several of the four elements in the fair use test. But with respect to the photographs, the distinction has got to be drawn between the audiovisual works and the music, which are basically being used as they were originally created in our show, albeit in excerpts, as opposed to the photographs. In Kelly, in the Kelly case, in the circuit versus Areva Soft, the Ninth Circuit pointed out that with respect to the third test, I'm sorry, the fourth test, as to whether our use of the photographs destroyed or harmed the market for those still photographs, it pointed out there's got to be a distinction made because, for example, in Kelly versus Areva Soft, they were thumbnail images, and the court found that nobody that really wanted the still photographs was going to substitute the thumbnail. In the Kelly case, didn't we say that thumbnails are different from the blow-up or enlargement of the photograph because if you try to enlarge a thumbnail, you lose quality of the picture. But here, you're taking an actual, I'm assuming it's a black-and-white photograph in many instances, you're taking that same photograph and using it in toto. You're not using a thumbnail of it, and you're doing it without the permission of the copyright owner. Well, of course, as we'll see, there's other reasons why we think that's okay, but that's exactly our point with respect to the stills because somebody that wants a high-quality 8x10 photograph of Elvis or Elvis and his father, and they go down to Hollywood Boulevard, and they buy one, by the way, authorized or not, it might be for sale there, they're getting an 8x10 glossy. Here, they would literally have to first have the technology to do, I guess, what they call a video capture of the photograph and somehow download it, and by the time they printed it out... Are you arguing that you fall within the confines of Kelly because you've taken a still photograph and displayed it in video form? Is that a factual analogy? Only with respect to that fourth element of the test, Your Honor. That's correct. Because we don't think that anyone that really wants a high-quality, beautiful photograph of Elvis is going to substitute the fact that it appears on a video, and they're going to capture it and transfer it to their hard drive or whatever the technology would be, and then print it out on their printer. They're not going to be the same quality, and the person that wants that 8x10 as a souvenir, or for whatever reason, is not going to substitute that with our video capture off of the DVD. Counsel, what if they just want to view a photograph of Elvis as opposed to having one in hand? Does your argument still hold? Yes, because then there's no damage to their... I mean, if they just want to view it, there's millions of places they can view those photographs online. In other words, we're talking about the actual copyrighted work. Has it harmed the market for their copyrighted work? If Your Honor's question is taken as opposed to its logical extreme, that somebody who was about to spend $5 on Hollywood Boulevard to buy the photograph is satisfied instead to just be able to look at it on our screen, then perhaps that point's well taken. But we don't really think that that's the market for the photographs. With respect to the injunction itself, basically the appellees have never acknowledged the footnote that we cited from the Campbell v. Acuff-Rose case, which essentially said that in a fair use case, not in a straight infringement like Napster, but in a fair use case, it's not a good idea to issue injunctions. And unfortunately, what's happened is it's sort of become a prior restraint argument, and that's my fault for using that terminology. But that's really not our point with respect to the First Amendment and the injunction. The point there is, and that's the article that Professors Volokh and Hemsley published in Duke Law also, said that when it's a fair use case, the First Amendment requires perhaps that the preliminary injunction not be granted. When it's a purely infringement case, pure plagiarism, I'm taking the Elvis show on Ed Sullivan and simply reselling it in my own video. That's a different situation, and I would not argue that an injunction were improper there. But when it's a... Also, do you think, then, that Campbell supports the proposition that answering an injunction is an abuse of discretion? Does it go that far? I don't believe so, Your Honor. I mean, there it was simply a footnote, but it does suggest I think the commentators that came after Campbell adapted or adopted that line of reasoning and perhaps do suggest that it would be an abuse of discretion. I don't think Campbell itself went that far. The other problem with the injunction here is that there is no There is a laches argument. The Elvis Estate and the Sofa Entertainment people that own the Ed Sullivan show knew that we had used those exact clips in previous Elvis shows. Granted, they didn't know exactly how they were going to be used in this show, but they were on notice as of a year before we released the definitive Elvis that we had used, not were going to use, that we had used those clips in previous Elvis shows. In fact, one of the Elvis shows, called Elvis Forever, was denominated in essence a one-hour trailer for the 16-hour definitive Elvis. So it was known that that was going to be part of the bigger show. And they did nothing. And they allowed us to go forward and spend all this money and commit to these 215 interviews, location shooting, original score. We spent $2 million. Then all of a sudden they come along and say, well, we'd like to enjoy the infringement. Now, if they had brought the action prior to completion of the project, wouldn't they have been classic prior restraint? Well, there's been several instances. I've defended not only Passport and this type of thing, because that's their business, but other types of biographers and documentarians. We've been sued several times for it would not be a prior restraint in the respect that it's not about to be broadcast or something. If they know of actual infringement that's taken place, they should have sued us not so much as a prior restraint of the definitive Elvis, but to let us know that they actually did have a problem and they weren't just rattling their sabers. They sent us a demand letter back in June with respect to Elvis Forever and never did sue on those clips that we used. The same clips are being used here. I'd like to ask you, suppose we thought an injunction was too drastic, but that at least on some of them there had been a copyright infringement that should be paid for, that there should be a license fee. I know you don't want to entertain that possibility, but hypothetically entertain it. Would you find that remedy devastating or could you live with that? Your Honor, not only could I live with it, I think that's probably a correct result here quite possibly. There's definitely a possibility here that ultimately you might find that some of the uses were not fair. We don't believe that, but it's a possibility, and that actually is exactly why this injunction should not have been granted. All over this record, declaration after declaration, they say that the reason why this is a bad thing and they should not have been able to do this is because we get license fees. Not only do they say we get license fees, they knew exactly how much, $10,000 a minute, $5,000 a minute, $7,000 a minute. So that's exactly why this injunction should not have been granted. I thought they also told you that they intended to, in essence, produce a competing work that was going to come out in 2004. So isn't the injunction also to protect their right, as in Ford or the Harper and Rowe case, to, in essence, produce their own biography using the material that they own, the copyrights? Well, number one, it's not competing. They acknowledged it in the record, Mr. Puglisi's declaration, that Mr. Hovey, on behalf of EPE, said we're doing a different documentary. We're not doing the same kind of biography that you're doing. Number two, it's too speculative to support an injunction, given that we have 16 hours of our own original product and 5 percent of it, perhaps, is their copyrighted works. It just doesn't seem right. It doesn't seem equitable that they would be able to enjoin our entire show based on a speculative possibility that they're going to be doing a competing show. And finally, and this is sort of endemic throughout the whole case, we've not really focused on the fact this is a collective of plaintiffs. I mean, they have to show their irreparable harm on an individualized basis. What they've done is they say, well, all of these plaintiffs together are probably going to put together an anthology. That's not fair to us. I mean, they have to analyze it on an individual basis. And that's not been done. That was not done by the trial court. It was just that, well, there are all of these infringements in the case. In any event, the 2004 anthology is too speculative. Ultimately, the other problem with the injunction is basically there is no balance of hardships here. We know that they could be compensated with dollars. Us, on the other hand, much like, I'm sorry, I'm forgetting the case now, the Blue Bicycle case, I think it was New Era, but in any event, there's cases discussing us losing our investment, us losing our customer relationship, us losing shelf space. If you balance the hardships, we should win that. Transformative use is the first element of fair use. I am amazed that the trial court, with all due respect, found in the Memorandums of Effect, which, by the way, was adopted essentially unchanged from the plaintiff's submission, he found that these uses were the exact same. There was nothing new added to them. So we used a five-second clip of the Ed Sullivan show. There was nothing added to it. That's amazing since there's 216 interviews surrounding these clips. There's 15 hours and 50 minutes, or I'm sorry, about 15 hours and 15 minutes of other material added to it. And I think the problem is the court misanalyzed that factor. It's not the transformation of the copyright itself. It's the transformation of the use. And much like in Nunez in this circuit, where modeling photographs later appeared in the newspaper, the Ninth Circuit said that's a transformative use because before they were modeling photographs. They were to titillate. They were to incite somebody to be appealed to this particular, I think it was Miss Puerto Rico. Now they're being used for news and it's a context. The pictures are the story. And that's what we have here. We're not using these as entertainment. We're using them in a biography, which the Second Circuit has said already meets the first factor. Once it's a biography, you've already met the first factor as a defendant. Counsel, I looked at a portion of the tapes, which were very well done, by the way. Thank you. And it's a close case for now, I must admit. And the difficulty I have with that is if I'm operating under an abuse of discretion standard and it's a close case, should I leave the district court's ruling in place because it is so close? No, because with respect to that underlying analysis, I think it's de novo review of law in the CBS case and the circuit said that as well. If there's sufficient material in the record, which there clearly is, you all can make that decision de novo. And I think the district court misanalyzed, most importantly, the fourth factor. The fourth factor, well, the third factor, let me touch on, substantiality of the use, it seems a lot because this is a 16-hour documentary. USA Today said this is the most exhaustive overview of the king's life ever done. I mean, as an aside, I know it's not in the record, but we just got a certificate from the Guinness Book of World Records for having the longest documentary on Elvis ever. I mean, this is a huge project, right? So you really have to be a big fan to sit through all this? Well, that may be, yes. Some of the reviews, you know, it depends on which reviews you read, Your Honor, from the audience, from the consumers. But basically, I think it's a de novo review of law. The substantiality of the taking here seems like a lot. But again, there was apparently no analysis by the district court of the individual copyright uses. And on the fourth factor, the most important one, the reason we win, and the plaintiffs have said the fourth factor is the most important. Does it interfere with their market for the copyrighted work? Counsel, where in the record is it stated that the copyrighted material only comprises 5% of the work? That's in Mr. Puglisi's declaration, Your Honor, in Volume 1 of the record. And how did he calculate that? Did he look at each frame and decide whether or not there was a use of copyrighted material and then do a mathematical computation? I believe. I'm not sure if he personally did the viewing or Mr. I'm blanking on his name, but his declaration is also in here. Gary DeVore, I think his name is, actually went through. He's an employee of Passport. And to be honest, that declaration was before they amended the complaint to add some additional copyrights. So to be fair and honest, I think it's more like 10% now of the entire show. With that regard to the percentage, how do you respond to the suggestion, I think it's in Harper and Row, where it talks about essentially taking the heart of the copyrighted material and utilizing it so that even though it only constitutes, let's say, 10% or less of the entire 16 hours, nonetheless, the five minutes that was taken from the appearance on the Ed Sullivan show, the portions of his most famous songs, is sort of the guts of the material that they hold a copyright. Well, the first argument, the best one is in this circuit, one of the many Los Angeles News Services case, I think it's the one versus Reuters, explained that yes, under certain circumstances, even taking the heart is okay because maybe that's all there is. And indeed, when you're taking the heart, it's almost like you're being punished for taking less instead of more. In that case, it wasn't the videotapes of the original. That's correct, Ron. But they did only take, they took, quote unquote, the heart, but that's all that was historical and newsworthy. And in the Monster Communications case, in the Ali fight in Zaire, there was also that argument made. And they said, but that's all there is, is the punches and the fight. That's what's important to the story. The fourth element here has to be decided in our favor because the law is, it's got to be the effect of the infringement or the alleged infringement on the copyrighted work in its entirety. There is zero evidence of this, except with respect, perhaps, to the still photographs, which I think Kelly takes care of. There is zero evidence of that here. All we have is a complaint that, well, wait a minute, we always license these. What the Elvis estate and the other plaintiffs want to do is exempt themselves from the fair use part of the Copyright Act. They're on record that they would take a license for a two-second clip. Several of the plaintiffs have said, we license two-second clips. There is no fair use in their world. And most disturbing of all, the Elvis estate said there are certain clips that were in this show that we would never license because we don't like the way they depict Elvis Presley. Elvis in concert, they said they never licensed that. So talk about shutting down and suppressing facts, which the Supreme Court said cannot be used to defeat a fair use defense in the Harper-Rowe case. Although the Supreme Court also recognized that if you hold the copyright, you can hoard it, if that's what you want to do. Not if it's going to suppress facts, if it's the only source of that information. How are we supposed to tell the Elvis Presley story if we're not allowed to show him in the 68 Comeback Special or the Elvis in concert? But getting back to that fourth element, the law is clear that their inability to license excerpts of the work is circular reasoning at its most insidious. If you say that the loss of licensing revenue means that our excerpts have harmed the market on the original copyrighted work as an entirety, there is no fair use defense. So those are the four elements. I believe they all essentially should have been decided, I think, by virtue of the fact that the law was not properly applied below. The trial court, unfortunately, rejected a fair use defense that was viable. And that's it. I'll say the rest of the panel. Thank you, Mr. Boyle. Mr. Hedges? Good morning. George Hedges on behalf of the police. My opposing counsels acknowledge that the question before this Court is a very limited one, and that is whether or not the Court below abused its discretion, made a clearly erroneous finding of fact, or misapplied the law. And I don't believe there's any question that the Court properly applied the standards of the law, properly applied the fair use standard to the facts that it determined. Counsel, do you take issue with opposing counsel's position that we can do a de novo review of the application of the facts of the law? No, you cannot do a de novo review of the facts. The facts are determined by the Court. You can determine that there was a clearly erroneous finding of fact, but it's not a de novo review. Of the application of the law to the facts? Of the application of the law, that is correct. You are entitled to the facts, yes. The legal standard is subject to de novo review. And if the Court utilized an incorrect legal standard, then you're entitled to reverse. But we have to accept the facts unless we find that they're clearly erroneous. Correct. There is nothing about this case, nothing about the infringements that are contained in the definitive Elvis, that should cause this Court to detour from the standard enunciated in Harper v. Roe with regard to taking the heart of a copyrighted work. And there's nothing that should change this Court's decision in the KCAL case where the heart of the work is appropriated and infringer cannot stand behind a claim of fair use. You can't skin the cream, as the Court said in Campbell, and get away scot-free. Don't you agree that there is a difference between the KCAL case and the other case in that the videotapes of the beating and the fight in Zaire are essentially what was the essence of the copyrighted work, whereas here you have literally, I guess, thousands of hours of video clips, and they took just a few minutes and then, according to them, transformed them by adding 200 hours worth of... Well, first off, Your Honor, I think the KCAL decision, which found that there was an infringement from use of Reginald Denny videotape, seriously supports our position because what they've done is they've taken the heart of entertainment performances. At least in KCAL you can say it's news or has some kind of newsworthy nature. The use of Elvis Presley's performances, his music, by the way, for which there's no... I don't know what their defense is on the music. The still photographs have already been mentioned. These are taken in their essence. And we have to understand, too, that an Elvis Presley song is two and a half or three minutes long. So when you're taking 30 seconds of that, you are taking a significant portion of that. And what they do throughout those 11 hours is they skim the cream. If you watch it, you'll see an interview, and then, as they advertised, you're going to get a brimming full of film clips. It isn't an interview saying, for example, in the comeback special, there is one moment where an individual says, you know, I designed his clothing and I designed the high collar and everything. And you could then juxtapose that to a brief couple-second illustration of that. That would be appropriate comment. But to have then 30 or 40 seconds of the performance, you're just using the performance. You aren't transforming it or turning it into anything different. You're taking the heart of that. And I think that in terms of the question of a transformative use, there's nothing transformative about taking a television show and putting it on videotape. This isn't a thumbnail or the kind of transformative use. The entire show wasn't put on tape. In watching the videotape, they were really snippets. Your Honor, that doesn't matter for purposes of a copyright infringement determination. I understand, but your characterization was putting an entire show on videotape, and it was not. I mean, the performances were never run in full. Actually, the Steve Allen performance by Elvis Presley where he sings to the hound dog is virtually in full. I forget what the timing is, but he runs through the whole song where he's singing to the hound dog. With regard to the Ed Sullivan performances, what they've done is they've taken the heart of each of those performances. And what's significant in this case is that's how they sold this. They didn't sell this as a scholarly biography. This isn't a biography of Richard Wright where they judiciously used small clips of his writing in an illustrative way. What they advertised this as, and I think this is very important in terms of looking at the equities here, contains every film and TV appearance. That's a quote. Every film and TV appearance. Brimming with classic film clips. There'll never be anything like it. Well, you know, you couldn't join the advertising without joining the actual use. Let me tell you my problem with this. It seems to me Campbell is the last word from the Supreme Court. And Campbell moves away from Hopper and emphasizes we're going to take all the factors together and balance them. And tells us, when you get down to it, it's a case-by-case analysis. That's correct. That makes it awfully hard to apply the law, but that's what we are applying the law, case-by-case. And we don't have any good precedent that I have seen on this kind of thing, a biography of somebody who was an entertainer. It's not going to be a scholarly thing. It's just a different subject, so you couldn't expect a scholarly biography particularly. So then the question, what is the best analogy? It seems to be district court cases, maybe mostly from New York where they have more litigation than we do. And I just wonder, if you're going to do a biography of an entertainer, if you're not going to have to do this sort of thing, take clips of the entertainer's work. Well, let's look at the cases, because I think if you're looking at the New York cases, what you're going to find is each of the two significant cases that they cite, which are district court decisions, the Hofheinz case and Monster Communications. Let me analyze each of those. In the Hofheinz case, you had the use of a 24-second film clip from a trailer for a B-grade 1950s sci-fi movie in which Peter Graves, the actor, appeared. And what's significant about Hofheinz, which is totally different from this situation, is the court found that there was no market for that trailer. There was no instance in which that trailer was going to be sold or clips from that trailer were going to be sold. And therefore, that case really turns on failing on the fourth factor. Similarly, with the Monster Communications v. Turner case, the Ali documentary case, the court first said the allegedly infringing uses were not particularly noticeable, even if you were looking for them. In other words, when the court went back and looked at the tape, they couldn't even find the uses were so insignificant. That's hardly the case here. Secondly, the court said that there was no showing in the record that the business of the plaintiff in that case, Monster Communications, was the sale of these film clips. The life's blood of each of my clients is the licensing of their property. That is their life's blood. The Steve Allen family relies upon the Steve Allen estate, the licensing of clips from the Steve Allen show, as their livelihood. Well, what would be your objection to having the court impose a license fee? Well, Your Honor, that would be the equivalent of saying you catch somebody stealing your property and they turn around to you and say, oh, I'll pay retail. That's not the way the Copyright Act works. If you appropriate a work as they've done here, then you can't turn around to the Steve Allen estate and say, I know we took, you know, the famous performance on your dad's show, but don't worry about it. We'll pay you a reasonable license fee. The Copyright Act says no, no, no, no, no. It says you got statutory damages and you get all the profits. There's a penalty for infringement. But the analogy isn't quite good because there is a public interest in this information. I accept what both of you say, that this is a major public figure. I'm not particularly interested in him, but I'm sure millions of people are. So they are interested in knowing everything about him. Absolutely. So that's different from stealing somebody's tangible property. You're right. And, Your Honor, you're perfectly entitled to do 250 interviews. You're entitled to do whatever you want. You're entitled to take a very brief film clip. You can say, for example, that he appeared on the Ed Sullivan Show and show two seconds of him on the Ed Sullivan Show. All you're doing then is illustrating a point that you're making in a biography. You're not appropriating the performance for its value as a performance. That's what's going on here, is they're taking this as entertainment and they are utilizing and exploiting the entertainment value of it. They're not entitled to do that to prove a point. That's copyright infringement. Once they take the essential value of the work away, that's copyright infringement. And the Campbell case doesn't alter that ruling from Harper v. Roe any more than which is the Harper v. Roe decision, by the way, has been fully supported by this circuit more recently than the Campbell decision. And the Campbell decision also, you have to understand, is a parity situation where the court specifically said, we aren't going to enjoy this because of all the First Amendment interests inherent in a parity, the transformative nature of a parity, and the fact that a parity doesn't compete against the original product. You aren't going to sit there and decide to not buy the original song, Pretty Woman, because there's a rap parody of that song. Here, what they're doing is they're taking the essence of my client's businesses, the licensing of film clips, copyrighted materials that they've paid significantly for, that they put significant effort into, and they're taking those as entertainment value, not for some scholarly purpose, not for some legitimate educational purpose, but they're taking them because they are great entertainment. Well, just to return to the question of a price on all that, you didn't really answer why your clients wouldn't be adequately compensated if a license fee were paid. If my clients had decided to license this for a license fee, that would have been appropriate. They're the copyright holders, and they chose not to, and they're perfectly entitled to do that. Well, maybe they are, but it's not answering the question why the compensation wouldn't be adequate. Because the Copyright Act says it's not adequate. The Copyright Act says, no, if you infringe, then you're entitled to all the profits, or you're entitled to statutory damages. It doesn't say that the court is now going to impose a license fee based upon some kind of market factors. That's not how it works. Well, there's a situation where an injunction is a matter of equity, where they advance the serious harm they'll suffer. I think that you can't ignore the equities. The equities are, Your Honor, that if this was a properly educational scholarly work within the meaning of fair use, that would be one thing. But once they take the entertainment value, once they take these performances and appropriate the heart of them, Harper v. Roe doesn't talk about the fact that there should have been a license paid. That could have been a result in Harper v. Roe. They could have said, hey, you know what? The excerpts of the Ford biography, people license this kind of thing every day. Why don't you license it? The Nation magazine and the Nation as a whole has a great deal of interest in reading these excerpts, so why don't you just force a license fee and somehow we'll judicially determine what that's going to be. That's not what Harper v. Roe decided. They said there's an injunction, and I would imagine that the case then moved to its damages phase. Counsel, what is your response to opposing counsel's argument that there is no irreparable harm because you've been able to articulate the license fee for each one of the components of the work? Your Honor, irreparable harm is presumed where there's copyright infringement. It is a presumption. It has been a presumption in this circuit, and unless this Court is going to make a very radical determination that But wouldn't that rebut the presumption? A presumption is not irrebuttable. The fact that a license fee is paid would beg the You can calculate damages very readily. Would that rebut the presumption of irreparable harm? No, because my clients want to be able to exploit these works that they own in their own way. They want to be able to create If there's a definitive Elvis collection to be made, it is not to be made by someone who just lifts all of these images. It's to be made by the Elvis Presley estate. If there's a definitive collection to be made, the copyright holders to the Elvis material, be it music, be it performances, still photographs, those copyright holders are entitled to create that. What's your response then to the language in Harper and Row that says I think it's Harper and Row, that says you can't hoard a copyright, that the public is also entitled to some access to images? The law is absolutely clear that you're entitled to hoard a copyright. In fact, the What's your business authority for Your Honor That you can hoard it and never let the public have access to it? Yeah, let me I believe, Your Honor, that it's in the Dr. Seuss decision by this circuit But let me quickly see if I can grab it While you're looking for that, could you respond to opposing counsel's argument that the product that they have come up with is not a competing product for yours and that the product that you are stating that will be done in 2004 is speculative? Can you respond to both of those assertions? Yes, so point number one, once somebody is able to steal a copyrighted work and appropriate it as they have in a DVD or a video, what you're doing in essence is destroying the market value of that copyrighted work. Why is anyone going to license anything from the Ed Sullivan show or from Elvis Presley Enterprises if you can simply do what these guys do? If you can just take the work whenever you want it and say, oh, it's a biography and appropriate the work, it's going to completely destroy the market. And I believe that answers both questions. Well, no, not necessarily, because if there is an avid market for Elvis works, this just may whet the appetite of people who want to see more. But, Your Honor, that's like saying Some people can never get enough of a good thing. If somebody is stealing, if someone is stealing Ford automobiles and riding around town and you're saying, gee, that's going to stimulate the interest in Ford automobiles, you can't steal something and then say, now that I've put this out there, what's going to happen? Legitimate buyers are now going to purchase what these people appropriated? That's a little different than the King's work. I think that Ford is a little more fungible than Elvis. I think a copyright is as much property, Your Honor, as any other form of property, and the law recognizes it as such. I think we have to look. One of the factors we have to look at is whether or not the market is harmed. And I think in looking at that, we have to determine whether or not a market would still exist after this product has been distributed. The market will be significantly diminished after this product is distributed. If an injunction is not upheld, because everyone else will simply steal the same property. How do we know that, though? You're saying that, but what is there in the record? In the record, we have numerous declarations from my clients explaining what their business is, explaining how they license this material, explaining the prices that they charge. Do you think that they're That explains why the market will be diluted, though. That's the missing piece for me. I didn't see a real explanation as to what they, a subject who is, you know, as popular as Elvis, how the market would ever dry up. Your Honor, why would you buy something if you can get it for free? Doesn't that dry up the market? If you can simply appropriate something for free, you have to understand what they did. They had to go, we don't know yet because we haven't conducted discovery, but they had to go and find this material somewhere. In Master Quality, as you can see, whatever they lifted, they found really good stuff to steal. They then take that and they put that on their videotapes. Now, let's say you're a television producer and you're producing an Elvis show. And you know that Passport just lifted Master Quality stuff for free. They never paid the copyright holders. Are you going to turn around now? You'd feel like an idiot if you paid the copyright holders after what these guys have done. You've completely demolished the market for my clients. Because why is someone going to pay if Passport gets it all for free? And it's going to be very interesting to find out where they got it from, because you don't get this stuff in the public library. Now, in terms of the site, I'm trying to locate that, Your Honor. Well, don't waste your time on that, because you only have a minute left. Yeah, I'd be glad to submit a letter. But I know it's in our brief, the copyright holder. Because the copyright monopoly is not subject to anyone being able to come and say, I get to use your copyrighted work because I've asked you and I've said I'm going to pay for it. That's not how the copyright monopoly works. The copyright holder, the artist, the creator, the holder of those rights, gets to determine when and how they're exploited. Except for fair use. Unless there's real fair use. And real fair use would have been here, for example, if they had just had all of these interviews. And then if we had just a second or two throughout this thing. But that's not what they did. And that's why, Judge Newton, I was commenting about the advertising. That's not what they're selling, even. If they tried to sell 250 hours of Elvis interviews, and that was legitimately what this is, what do you think the market would be for that? There wouldn't be a market unless they had my client's property. My time's up. First, Judge Newton has focused exactly on the problem. This is a hybrid. To do a biography about an entertainer, you're going to have to use his performance as an entertainer. So already you have a different situation than all of the cases they cited. This is a unique situation. Counselor, it does seem to me that this is different from the A&E case in the Southern District of New York, where it was just a 45-second clip from a trailer. I mean, here you have taken some really good footage and used it throughout the 16-hour disc set. And how do you respond to Mr. Hedge's argument that you've sort of taken the wind out of future sales to others who would love to use that same material for their own uses? I see that I'm out of time. Yeah, please go ahead. I have yet to hear a response in the briefs, in the trial court, or to Judge Rawlinson's question. What about the fact that the Copyright Act and the Fair Use says it has to be the effect of the market on the copyrighted work? The copyright is in the Ed Sullivan Show, the one-hour Ed Sullivan Show. The copyright is not in a three-minute clip of the Ed Sullivan Show. They have never shown an effect on the copyrighted work. They use the circular reasoning, our business is to license cliffs. And who in their right mind would ever pay for it if Passport gets away with it? It's not a question of Passport getting away with it. If it's a fair use, we didn't have to pay for it to begin with. And they don't address the fact that the market will continue for fictional products. I used to work at a studio. If we did a movie and Elvis was on the TV during a dinner scene, that's not fair use. We'd still have to license that clip from them. But when we're doing a biography, it falls squarely within the four factors. I mean, in the statute, in the section of biography, it's commentary and criticism. And, yes, it may not be classy enough for them. Maybe we don't have enough professors. But in this day and age where celebrities are running for governor, I mean, the line is being blurred after all. It's hard to know what the scholar of research is. I submit that the fair use elements really were not properly analyzed by the court below, that, in fact, the fair use elements are all in the defendant's favor here, and the injunction should not have been issued. Thank you. The case just argued is submitted. I want to thank both counsels. Very well argued and appreciated your help. This is a very difficult case, and we'll try and get our way through it as quickly as we can. Thank you. The court is adjourned.
judges: Noonan, Tallman, Rawlinson